IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | |
|---|---|
| HARTFORD CASUALTY INSURANCE, an Indiana corporation, and TWIN CITY FIRE INSURANCE COMPANY, an Indiana corporation, ) ) ) ) | Civil No.  2:10-CV-01098 BSJ |
| Plaintiffs, ) | **MEMORANDUM OPINION** |
| vs. ) | **& ORDER** |
| ) | **(Fed. R. Civ. P. 56)** |
| SOFTWAREMEDIA.COM, a Washington corporation, PERSEUS TRADING CORPORATION, a Washington corporation a/k/a PERSEUS TRADING, INC., ADAM CHILDERS and TODD FRANCIS, ) ) ) ) ) ) | |

HARTFORD CASUALTY
INSURANCE, an Indiana corporation,
and TWIN CITY FIRE INSURANCE
COMPANY, an Indiana corporation,                    )

        Plaintiffs,                    )

vs.                    )

SOFTWAREMEDIA.COM, a
Washington corporation, PERSEUS
TRADING CORPORATION, a
Washington corporation a/k/a
PERSEUS TRADING, INC., ADAM
CHILDERS and TODD FRANCIS,                    )

        Defendants;                    )
_____

SOFTWAREMEDIA.COM, a
Washington corporation, PERSEUS
HOLDING CORPORATION, a
Washington corporation, and
PERSEUS TRADING
CORPORATION, a Washington
corporation,                    )

        Counterclaimants,                    )

vs.                    )

HARTFORD CASUALTY
INSURANCE, an Indiana corporation,
and TWIN CITY FIRE INSURANCE
COMPANY, an Indiana corporation,                    )

        Counterclaim
        Defendants.                    )

Civil No.  2:10-CV-01098 BSJ

**MEMORANDUM OPINION
& ORDER
(Fed. R. Civ. P. 56)**

```
┌─────────────────────────────────┐
│            FILED                │
│  CLERK, U.S. DISTRICT COURT     │
│    March 20, 2012 (3:03pm)      │
│       DISTRICT OF UTAH          │
└─────────────────────────────────┘
```

\* \* \* \* \* \* \* \* \*

On November 4, 2010, the plaintiffs filed their Complaint commencing the above-entitled action, invoking the diversity jurisdiction of this court pursuant to 28 U.S.C. § 1332(a)(1) (2006 ed.).[1]

As pleaded in the Complaint, plaintiffs Hartford Casualty Insurance ("Hartford") and Twin City Fire Insurance Company ("Twin City") seek a declaratory judgment that that neither of them are obligated to defend or indemnify SoftwareMedia.com, Inc., Perseus Trading, Adam Childers, and Todd Francis for any and all losses arising out of the events that became the subject matter of the civil action entitled *Microsoft Corp. v. SoftwareMedia.com, Inc., Adam Childers, & Todd Francis*, Civil No. 2:10-CV-00526 CW (D. Utah, filed June 7, 2010), said action having been settled and dismissed with prejudice in or about September of 2010.[2]

---

[1]28 U.S.C. § 1332(a)(1) provides:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
(1) citizens of different States; . . .

[2]In that case, Judge Waddoups entered a stipulated Permanent Injunction prohibiting the defendants from "buying or selling Microsoft Software Assurance, as a stand-alone product," and from "assisting, aiding or abetting any other person or business entity" in doing the same.  (Permanent Injunction, filed September 2, 2010 (dkt. no. 44), in *Microsoft Corp. v. SoftwareMedia.com, Inc., et al.*, Civil No. 2:10-CV-00526 CW (D. Utah).)  The Permanent Injunction also decreed that "the terms and conditions of the Permanent Injunction entered by this Court on January 7, 2005 in the case of *Microsoft Corp. v. Perseus Trading Corporation, et al.*, Civil No. 2:04-CV-0056 PGC, shall remain in full force and effect," *viz.*, forbidding the defendants from infringing Microsoft's copyrights and trademarks.   (*Id.*)

Defendants SoftwareMedia.com and Perseus Trading Corporation, together with non-defendant Perseus Holding Corporation (collectively "SoftwareMedia") counterclaimed against Hartford and Twin City for breach of contract, seeking an award of damages exceeding $1,800,000, resulting from the insurers' refusal to defend or indemnify SoftwareMedia in connection with the 2010 *Microsoft* litigation.

On August 25, 2011, Hartford and Twin City filed a motion for summary judgment asserting that as a matter of law, Hartford and Twin City "owe no duty to defend or indemnify Defendants Softwaremedia.com, Inc., Perseus Trading Corporation, Adam Childers, and Todd Francis for the claims alleged" in the 2010 *Microsoft* litigation.[3] They argue that in 2010, Microsoft did not plead that the defendants caused "personal or advertising injury" within the scope of coverage under the two policies: "the gravamen of Microsoft's complaint is that Defendants offered their customers one type of Microsoft product, but then actually sold them a less valuable product, thereby engaging in the 'bait and switch' sales activities that allegedly harmed Microsoft."[4]  Further, even if coverage under the Hartford policy was triggered by Microsoft's complaint, "a number of exclusions are implicated that independently bar any coverage for this claim," given Microsoft's allegations concerning SoftwareMedia's conduct; the Twin City policy "is

---

[3](Plaintiffs' Motion for Summary Judgment, filed August 25, 2011 (dkt. no. 17), at 1.)

[4](Plaintiffs' Memorandum in Support of Motion for Summary Judgment, filed August 25, 2011 (dkt. no. 18) ("Pltfs' Mem."), at 3.)

not even potentially implicated, as it contains an endorsement that excludes all coverage for 'personal and advertising injury.'"[5]

On September 26, 2011, SoftwareMedia filed a cross-motion for summary judgment, asserting that "when compared to the language of the civil complaint filed by Microsoft against Defendants and Counterclaimants, the subject insurance policies triggered plaintiffs' duty to defend under Utah law," and when Hartford and Twin City "refused to provide a defense in that action," SoftwareMedia "were forced to settle with Microsoft"; having refused to defend, Hartford and Twin City "are now estopped from contesting the reasonableness of the settlement under Utah law and must reimburse" SoftwareMedia "for all moneys expended in that settlement, and for defense fees and costs incurred" in the 2010 *Microsoft* litigation.[6]  SoftwareMedia argues that "when read in conjunction with extrinsic evidence provided to The Hartford," the 2010 Microsoft Complaint pleaded "Lanham Act print-media slogan infringement claims – a type of 'personal and advertising injury' expressly covered by" the Hartford policy.[7]  Conceding

---

[5](*Id.*)

[6](Defendants'/Counterclaimants' Cross-Motion for Summary Judgment on All Claims, filed September 26, 2011 (dkt. no. 19), at 1.)  The Cross-Motion recites that "*Defendants and Counterclaimants*, having refused defense, are now estopped from contesting the reasonableness of the settlement under Utah law," but it seems apparent from the context that the Cross-Motion intended to refer to the plaintiffs, Hartford and Twin City.

[7](Consolidated Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants'/Counterclaimants' Cross-Motion for Summary

(continued...)

that Microsoft's fraud-based claims against SoftwareMedia were not covered by

Hartford's policy and ultimately would not be paid under the policy, SoftwareMedia

argues that the insurer nevertheless owed a duty to defend the *entire* Microsoft action,

given the claim for alleged Lanham Act print-media slogan infringement that falls within

the policy's "personal and advertising injury" coverage.[8]

Both sides insist that "no material facts are in dispute," and that summary

judgment is appropriate on all claims as a matter of law.[9]  *See, e.g.*, *Valdez v. Squier*,

--- F.3d ----, 2012 WL 547404, at *7 (10th Cir., February 21, 2012) ("Summary judgment

is appropriate when 'there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(a)).

### UNCONTROVERTED FACTS

The parties agree that at pertinent times, SoftwareMedia was insured under a

commercial general liability policy (*viz.*, the Commercial General Liability Coverage

Form) issued by Hartford, *viz.*, Policy No. 34 UUQ TZ4569 SC, with effective dates from

---

[7](...continued)
Judgment on All Claims, filed September 26, 2011 (dkt. nos. 20-21) (Defs' Mem.") at 3.)
SoftwareMedia avers that Hartford "was provided with proof of print advertising ran by
SoftwareMedia which included the phrase 'Microsoft Gold Partner,' a variation of
Microsoft's 'Gold Certified Partner' slogan," and that Microsoft sought damages from
SoftwareMedia arising from "the use of those print slogans."  (*Id.* at 3-4.)

[8](*Id.* at 4 (citing *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, 140 P.3d 1210,
1216).)

[9](Defs' Mem. at 5; Plaintiffs' Motion for Summary Judgment, filed August 25,
2011 (dkt. no. 17), at 1.)

January 1, 2007, through January 1, 2008 (the "CGL Coverage Form"), which was

renewed annually.  The parties also agree that SoftwareMedia was insured under an

umbrella liability policy (the "Umbrella Liability Policy") issued by Twin City, Policy

No. 34 XHQ XR3759, with effective dates from January 1, 2007, through January 1,

2008, which was renewed annually.

### Hartford's Commercial General Liability Policy

The policy language defining the pertinent coverage in the Hartford CGL

Coverage Form states: "We will pay those sums that the insured becomes legally

obligated to pay as damages because of 'personal and advertising injury' to which this

insurance applies. We will have the right and duty to defend the insured against any 'suit'

seeking those damages."[10]  The CGL Coverage Form defines "personal and advertising

injury" as "injury . . . arising out of one or more of the following offenses":

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right
of private occupancy of a room, dwelling or premises that a person
occupies, committed by or on behalf of the owner, landlord or lessor;

d. Oral, written or electronic publication of material that slanders or libels a
person or organization or disparages a person's or organization's goods,
products or services;

---

[10](CGL Coverage Form, COVERAGE B PERSONAL AND ADVERTISING
INJURY LIABILITY, § 1.a, annexed as Exhibit 2 to Pltfs' Mem.)

e. Oral, written or electronic publication of material that violates a person's right of privacy;

f. Copying, in your "advertisement," a person's or organization's "advertising idea" or style of "advertisement";

g. Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement";

h. Discrimination or humiliation that results in injury to the feelings or reputation of a natural person.[11]

"Suit" is defined by the policy as "a civil proceeding in which damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged."[12]   The policy also defines "advertisement"[13] and "advertising idea."[14]

The CGL Coverage Form also includes a series of exclusions, such as a "Your Web Site" exclusion, which excludes coverage for "'personal and advertising injury' arising out of 'your web site' or an electronic chat room or bulletin board hosted, owned,

---

[11](*Id.* at SECTION V – DEFINITIONS, § 17.)

[12](*Id.* at SECTION V – DEFINITIONS, § 21.)

[13]"Advertisement" is defined as "widespread public dissemination of information or images. for the purpose of the sale of products," "other than through The Internet." (*Id.* at SECTION V – DEFINITIONS, § 1, as modified by CGL Coverage Form, Endorsement HC 00 89 10 01, annexed as Exhibit 3 to Pltfs' Mem.)

[14]"Advertising idea" is defined as "any idea for an 'advertisement'." (*Id.* at SECTION V – DEFINITIONS, § 2.)

or over which control is exercised by any insured."[15]  In turn, "your web site" means "a

web page or set of interconnected web pages prepared and maintained by you, or by

others on your behalf, that is accessible over an internet."[16]  Other coverage exclusions

include "Breach of Contract,"[17] "Infringement of Intellectual Property Rights,"[18]

'Knowing Violation Of Rights Of Another,'[19] "Material Published With Knowledge Of

Falsity,"[20] and "Material Published Prior To Policy Period."[21]

---

[15](CGL Coverage Form, Endorsement (form HC 00 89 10 01), annexed as Exhibit 3 to Pltfs' Mem.)

[16](*Id.*)

[17](*See* CGL Coverage Form, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, § 2.f (excluding coverage of "personal and advertising injury" arising out of "a breach of contract, except an implied contract to use another's 'advertising idea' in your 'advertisement'").)

[18](*See id.* at COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, § 2.i (excluding coverage of "'personal and advertising injury' arising out of any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity," excepting infringement in the insured's "advertisement" of: (1) copyright; (2) slogan; or (3) title of any literary or artistic work).)

[19](*See id.* at COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, § 2.a (excluding coverage of "'personal and advertising injury' arising out of an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting 'personal and advertising injury'").)

[20](*See id.* at COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, § 2.b (excluding coverage of "'personal and advertising injury' arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity").)

[21](*See id.* at COVERAGE B PERSONAL AND ADVERTISING INJURY

(continued...)

**Twin City's Umbrella Liability Policy**

The Twin City Umbrella Liability Policy states that "[w]e will pay those sums that the 'insured' becomes legally obligated to pay as 'damages' in excess of the 'underlying insurance,'" because of an injury "to which this insurance applies caused by an 'occurrence',"[22] as that term is defined by the underlying insurance policy.[23]  The Umbrella Liability Policy also contains an exclusion of coverage that reads: "This policy does not apply to 'personal and advertising injury.'"[24]  This ¶ B.4 exclusion itself includes an "EXCEPTION" stating that "[t]his exclusion does not apply if 'underlying insurance' is applicable to 'personal and advertising injury' and to claims arising out of that 'personal and advertising injury'."[25]  These terms of the Umbrella Liability Policy are themselves modified by an Endorsement (form XL 21 33 11 00), which "modifies insurance provided under the UMBRELLA LIABILITY POLICY" as follows: "This

---

[21](...continued)
LIABILITY, § 2.c (excluding coverage of "'personal and advertising injury' arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period").)

[22](Umbrella Liability Policy (form XL 00 03 06 05), SECTION I – COVERAGES, ¶ A.1, annexed as Exhibit 4 to Pltfs' Mem.)

[23]As to terms such as "personal and advertising injury" or "suit," the Umbrella Liability Policy likewise looks to the definitions found in the underlying insurance policy, in this case the Hartford CGL Coverage Form.  (*Id.* at SECTION VII – DEFINITIONS.)

[24](*Id.* at SECTION I – COVERAGES, ¶ B.4.)

[25](*Id.*)

policy does not apply to 'personal and advertising injury.'"[26]

SoftwareMedia argues that the pertinent Umbrella Liability Policy language, namely its Endorsement modifying an exception to the ¶ B.4 exclusion[27] as to "personal and advertising injury," is ambiguous, and should be construed strictly against the insurer and in favor of coverage.[28]

Remembering that in this context, an endorsement is "[a]n amendment to an insurance policy," *Black's Law Dictionary* 607 (9th ed. 2009), the terms of the Umbrella Liability Policy as thus amended are clear on this point: "This policy does not apply to 'personal and advertising injury.'"

### The 2010 Microsoft Litigation

On June 7, 2010, Microsoft filed a Complaint against SoftwareMedia.com, Messrs. Childers and Francis, seeking injunctive relief and damages arising from the defendants' alleged infringement of Microsoft's copyrights and other tortious conduct. *See Microsoft Corp. v. SoftwareMedia.com, Inc.*, Civil No. 2:10-CV-00526 CW (D. Utah). The 2010 Microsoft Complaint alleged that "[f]rom at least 2007 to the present,

---

[26](Endorsement (form XL 21 33 11 00), annexed as Exhibit 5 to Pltfs' Mem.)

[27]The convoluted language typical of liability insurance coverage, exclusions and exceptions to exclusions calls to mind Winston Churchill's oft-quoted description of Russian foreign policy in an October 1, 1939 radio broadcast: "It is a riddle wrapped in a mystery inside an enigma." 6 *Winston S. Churchill: His Complete Speeches, 1897–1963*, 6161 (Robert Rhodes James, ed. 1974).

[28](Defs' Mem. at 35.)

Defendants have actively engaged in a fraudulent bait-and-switch scheme involving sales of Microsoft software licenses and Software Assurance," a software maintenance support product.[29]   Specifically, Microsoft alleged that

> Defendants have switched and are continuing to switch customer orders for Microsoft software licenses with less expensive Software Assurance which is not a license and creates no license rights.  Upon information and belief, Defendants have engaged in this sales practice with intent to deceive Microsoft and Defendants' customers, and to retain for Defendants the significant price difference between licenses and Software Assurance.  A direct and inevitable consequence of Defendants' fraud has been widespread infringement of Microsoft's copyrights by unsuspecting customers who were led by Defendants to believe they had purchased valid licenses to use Microsoft software."[30]

SoftwareMedia's alleged fraudulent bait-and-switch scheme necessarily involved distribution of unlicensed Microsoft software, providing the footing for Microsoft's copyright infringement claim.  Microsoft's sales records indicated that "since July 2006 SoftwareMedia.com has sold 49,891 units of Software Assurance without software licenses,"[31] consistent with SoftwareMedia's ongoing "bait-and-switch" software license scheme.

Microsoft also alleged that "by this conduct, including their advertising activities and unauthorized use of Microsoft's software, components, screen displays, product

---

[29](Complaint, filed June 7, 2010, in *Microsoft Corp. v. SoftwareMedia.com, Inc.*, Civil No. 2:10-CV-00526 CW (D. Utah), annexed as Exhibit 1 to Pltfs' Mem., at ¶ 21.)

[30] (*Id.*)

[31](*Id.* at ¶ 30.)

-11-

packaging and marks to describe the items that they distribute and sell, Defendants misappropriated Microsoft's advertising ideas and style of doing business and infringed Microsoft's copyrights, titles and slogans and trademarks."[32]  Microsoft's second claim for trademark infringement alleged that "[b]y engaging in bait-and-switch fraud and other unlawful practices and improper means described in this Complaint," SoftwareMedia had failed to satisfy the conditions for use of Microsoft's marks, and was continuing its use of Microsoft's marks "including the stylized 'Microsoft Gold Certified Partner' logo . . . in connection to its deceptive sales practices with the willful and calculated purposes of misleading, deceiving or confusing customers and the public, and trading upon Microsoft's goodwill and business reputation."[33]  Microsoft's third claim made parallel allegations concerning SoftwareMedia's use of Microsoft's visual designs "in connection to its deceptive sales practices" with "the willful and calculated purposes of misleading, deceiving or confusing customers and the public," to the injury and damage of Microsoft.[34]

Microsoft's Complaint also pleaded claims for fraud, breach of contract, intentional interference with economic relations and unjust enrichment, all of which were grounded in SoftwareMedia's "engaging in bait-and-switch fraud and other unlawful

---

[32](*Id.* at ¶ 33.)

[33](*Id.* at ¶¶ 48, 53.)

[34](*Id.* at ¶¶ 63, 65-66.)

practices described in this Complaint" for "the improper purpose of retaining for Defendants the price difference between Microsoft software licenses and Software Assurance,"[35] or allegations to essentially the same effect.[36]  The 2010 Microsoft Complaint sought damages, including enhanced damages for willful infringement, as well as restitution, punitive damages, an accounting of profits, and injunctive relief.[37]

On or about August 9, 2010, the parties to the 2010 *Microsoft* litigation reached a settlement agreement that required the defendants to pay $1.8 million to Microsoft.[38] Pursuant to the settlement agreement, the court also entered a permanent injunction on September 2, 2010, barring SoftwareMedia from buying or selling Microsoft Software Assurance as a stand-alone product.  Aside from the entry of the permanent injunction, the parties stipulated that the 2010 *Microsoft* litigation be dismissed with prejudice, which it was on September 8, 2010.[39]

---

[35](*Id.* at ¶¶ 85, 90.)

[36](*Id.* at ¶¶ 71, 80.)

[37](*Id.* at 32-37 ("Prayer for Relief").)

[38](*See* Answer and Counterclaim, filed January 13, 2011 (dkt. no. 6), at 10 ¶ 19.)

[39](*Id.* at 11 ¶ 22; *see* Stipulated Motion for Permanent Injunction, filed August 11, 2010 (dkt. no. 42); Permanent Injunction, filed September 2, 2010 (dkt. no. 44); Stipulation for Order of Dismissal, filed September 7, 2010 (dkt. no. 45); and Order of Dismissal, filed September 8, 2010 (dkt. no. 46), in *Microsoft Corp. v. SoftwareMedia.com, Inc., et al.*, Civil No. 2:10-CV-00526 CW (D. Utah).)

**ANALYSIS**

The parties concur that Utah law applies to decide the substantive questions in this

case.  Hartford and Twin City correctly submit that

> [i]n a declaratory-judgment action regarding liability insurance coverage,
> the burden of proof depends in part on the specific issue in dispute.  *See
> Utah Farm Bureau Ins. Co. v. Dairyland Ins. Co.*, 634 F.2d 1326, 1328
> (10th Cir. 1980). The burden of establishing coverage under an insurance
> policy is on those who wish to come within the coverage of the policy, even
> when the insurer commences a declaratory action to resolve the question.
> *Id.*; *see also Fireman's Fund Ins. Co. v. Videfreeze*, 540 F.2d 1171, 1174-76
> (3d Cir. 1976); *Hartford Accident & Indem. Co. v. Shaw*, 273 F.2d 133, 137
> (8th Cir. 1959) (holding that the burden of proving coverage under the
> omnibus clause of an insurance policy is upon the person seeking
> coverage); *Reliance Life Ins. Co. v. Burgess*, 112 F.2d 234, 238 (8th Cir.
> 1940) ("[i]t is a fundamental rule that the burden of proof in its primary
> sense rests upon the party who, as determined by the pleadings, asserts the
> affirmative of an issue"); *Barker v. Goldberg*, 705 F. Supp. 102, 104-05
> (E.D.N.Y. 1989). Thus, although Plaintiffs initiated this
> declaratory-judgment action, Defendants, as the parties seeking coverage,
> have the burden to prove their entitlement to coverage under the insuring
> agreement of the policy. Only if Defendants meet their burden of
> establishing that the claim is within the scope of the policies' coverage
> provisions does the burden shift to Plaintiffs to prove that the claim is not
> covered because of an exclusion.[40]

In turn, SoftwareMedia correctly posits that "'[i]f the loss falls within the policy's

insuring clause, coverage is triggered under the policy.'"[41]

---

[40](Pltfs' Mem. at 16.)

[41](Defs' Mem. at 16.)  In SoftwareMedia's memorandum, the above-quoted
passage was set forth as though *quoted* from a Utah case: "*LDS Hosp., Div. of
Intermountain Health Care v. Capitol Life Ins. Co.*, 765 P.2d 857, 859 (Utah 1988)
(quoting *Browning v. Equitable Life Assurance Soc.*, 80 P.2d 348 (Utah 1938))." (*Id.*)  In
fact, the above-quoted passage is, at best, a paraphrase.  In *LDS Hosp.*, 765 P.2d at 859,

(continued...)

-14-

If coverage for the loss is triggered by the insuring clause, we then move to

--------------------

[41](...continued)
the Utah Supreme Court quoted this language from the earlier *Browning* opinion:

> When an insured claims a right to recover under the accident
> provisions of the policy, all he need do is bring himself within
> the field therein defined and show his injury or disability was
> proximately and predominantly caused through violent,
> external and accidental means.  He then has brought himself
> within the policy, and the terms thereof have been met. . . .
> When he brings himself within the insuring clause he has
> made his case . . . and any exceptions or conditions which
> would then deny him relief, take him out of the indemnity
> provisions, render them inoperative as to him, are matters of
> defense, and the burden thereof rests upon the insurer . . . .
>
> . . . [L]imitations, exceptions or conditions which may relieve
> the insurer from liability, which may be set forth in the policy
> outside of the language of the insuring clause, or which may
> exist outside of the policy entirely, must be made and
> established by the insurer to escape liability thereunder.

SoftwareMedia's paraphrase appears to be consistent with the meaning of the
actual language of the cited Utah Supreme Court's opinions.  Nonetheless, under our
Rules, the members of the Bar of this court owe an independent ethical duty of candor to
the court.  Counsel's ethical duty to "present the client's case with persuasive force"

> is qualified by the advocate's duty of candor to the tribunal.  Consequently,
> although a lawyer in an adversary proceeding is not required to present an
> impartial exposition of the law or to vouch for the evidence submitted in a
> cause, the lawyer must not allow the tribunal to be misled by false
> statements of law or fact or evidence that the lawyer knows to be false.

Rule 3.3 cmt. [2], Utah R. Prof. Cond., *adopted by reference in* DUCivR 83-1.1(g).
Counsel should avoid the misattribution of legal argument or paraphrase as the *quoted
authoritative language* of the State's highest court on a matter of State law.  *Cf.* Rule 3.3
cmt. [4] ("Legal argument based on a knowingly false representation of law constitutes
dishonesty toward the tribunal.").

-15-

the policy's exclusions to determine whether they nonetheless bar coverage. Policy exclusions are "matters of defense, and the burden thereof rests upon the insurer." *Id.* If the loss falls within the policy's insuring clause, and the insurer cannot meet its burden to show any exclusions apply, the loss is covered. *Id.*[42]

When determining whether the insurer has a duty to defend a particular claim of loss, at the outset the court focuses on two documents: the insurance policy and the underlying complaint:

> "An insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations of the complaint." *Fire Ins. Exch. v. Estate of Therkelsen*, 2001 UT 48, ¶ 21, 27 P.3d 555 (internal quotation marks omitted); *see also Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 8, 983 P.2d 575; *Sharon Steel v. Aetna Cas. & Sur.*, 931 P.2d 127, 133 (Utah 1997). In *Therkelsen*, we cited to an alternative formulation of this rule: "'The test is whether the complaint alleges a risk within the coverage of the policy.'" 2001 UT 48, ¶ 21 n.3 (quoting *Continental Cas. Co. v. Alexis I. Du Pont Sch. Dist.*, 317 A.2d 101, 103 (Del. 1974)).

*Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 16, 140 P.3d 1210, 1214.[43] In *Therkelsen*, the Utah Supreme Court noted that an insurance contract may base the duty to defend on the face of the complaint and its allegations, *or* on the facts and circumstances underlying the complaint; "whether extrinsic evidence is admissible to determine whether an insurer has a duty to defend an insured turns on the parties' contractual terms." 2001 UT 48, at ¶¶ 22-25, 27 P.3d at 560-61.

---

[42](Defs' Mem. at 16.)

[43]Throughout the United States, "[a]s a general rule, an insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations in the complaint." 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 200:18 (3d ed. 1999).

> [W]hen the terms of an insurance contract condition the duty to defend
> upon allegations contained on the face of the complaint, "extrinsic evidence
> is irrelevant to . . . determin[e] . . . whether a duty to defend exists." For
> example, an insurer would have no duty to defend an insured based on a
> complaint sounding solely in battery when the policy excludes intentional
> torts from coverage. Under these circumstances, the "duty-to-defend
> analysis . . . focus[es] on two documents: the insurance policy and the
> complaint. 'An insurer's duty to defend is determined by comparing the
> language of the insurance policy with the allegations of the complaint,'"
> and extrinsic evidence plays no part in the analysis.

*Equine Assisted Growth and Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 10,

266 P.3d 733, 736 (footnotes omitted) (quoting *Therkelsen*, 2001 UT 48, ¶ 25 and

*Benjamin*, 2006 UT 37, ¶ 16, 140 P.3d 1210 (quoting *Therkelsen*, 2001 UT 48, ¶ 21)). As

*Therkelsen* explains, "[i]f the parties make the duty to defend dependent on the

*allegations* against the insured, extrinsic evidence is irrelevant to a determination of

whether a duty to defend exists." 2001 UT 48, ¶ 25, 27 P.3d at 561 (emphasis added).

"Indeed, in such a case it would be error for the trial court to consider extrinsic evidence,

as it is wholly irrelevant to the issue of whether the insurer has a duty to defend its

insured." *Id.* at ¶ 23 (footnote omitted).[44]

--------

[44]

On the other hand, when policy terms define the scope of the duty to defend
in reference to something other than the allegations in the complaint, a court
may look beyond the text of the complaint to determine whether the duty
has been triggered. In that situation, an inquiry limited to the face of the
policy and the complaint leaves unanswered the question of whether the
insurer has a duty to defend. Thus, while the analysis always begins with an
examination of the policy language and the complaint, it ends there only if
the policy terms when compared with the allegations definitively indicate
that there is or is not a duty to defend. Otherwise, the duty-to-defend

(continued...)

-17-

Here, the key question is whether the Hartford CGL Policy's duty-to-defend clause "is triggered by the facial language of a complaint or whether the clause is triggered by the actual facts underlying the complaint." *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2009 UT App 200, ¶ 25,  216 P.3d 971, 972, *aff'd*, 2011 UT 49, 266 P.3d 733.[45]

---

[44](...continued)
inquiry requires information that must be presented in the form of extrinsic evidence.

*Equine Assisted*, 2011 UT 49, ¶ 11, 266 P.3d at 736 (footnote omitted) (citing *Therkelsen*, 2001 UT 48, ¶ 25 ("[I]f, for example, the parties make the duty to defend dependent on whether there is actually a 'covered claim or suit,' extrinsic evidence would be relevant to a determination of whether a duty to defend exists.")).

[45]In *Equine Assisted*, a case heavily relied upon by SoftwareMedia, the Utah Supreme Court compared "the relevant policy provisions with the complaint to determine whether the contract conditions the duty to defend solely in reference to the complaint." *Equine Assisted*, 2011 UT 49, ¶ 12, 266 P.3d at 736.  In that case, the policy covered "all Loss . . . arising from any Claim made against the Insureds during the Policy Period," including "Costs of Defense," defined as "reasonable and necessary fees, costs, and expenses . . . resulting solely from the investigation, adjustment, defense and appeal of any Claim against the Insureds," whether in or out of court  *Id.*  The Utah Court of Appeals had ruled that the circumstances triggering that clause "constitute objective facts, the truth or falsity of which are not determined solely by the allegations" or caption of the complaint.  *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2009 UT App 200, ¶ 7, 216 P.3d 971, 972.  The Utah Supreme Court agreed: "we conclude that *the relevant contractual provision ties the duty to defend to facts not contained in the complaint*.  As a result, we hold that extrinsic evidence is necessary to determine whether Carolina Casualty had a duty to defend EAGALA."  2011 UT 49, ¶ 12, 266 P.3d at 736 (emphasis added).
   The policy language in *Equine Assisted* thus proves to be distinguishable from that of Hartford's CGL policy in applying the *Therkelsen* standard.  And *Equine Assisted* embraces and applies the *Therkelsen* standard; it is *not* a blanket "mandate from the Utah Supreme Court that an insurer consider extrinsic evidence when it affects whether or not

(continued...)

As explained above, the Hartford CGL Policy comprehends a duty to defend "a civil proceeding in which damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies *are alleged*."[46]  Hartford contends that its policy "makes the duty to defend dependent upon the allegations against the insured," and thus "extrinsic evidence is irrelevant to the duty-to-defend determination here."[47]  Hartford submits that the Tenth Circuit "recently determined that, under Utah law, a policy identical to the Hartford policy required courts to consider only the underlying complaint (without reference to any extrinsic evidence) in determining whether a duty to defend existed."[48]

In *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153 (10th Cir. 2010), the court of appeals concluded that "the CGL policies here preclude the admission of extrinsic evidence to determine the scope of [the insurer's] duty to defend":

> In each of the CGL policies, EMC assumes the duty to defend against any "suit" seeking "damages because of . . . property damage." . . . The term "suit," in turn, refers to civil proceedings in which a party "allege[s]" the existence of damages within the coverage of the applicable

_____

[45](...continued)
coverage would be triggered when comparing the language of a complaint to the language of an insurance policy," as SoftwareMedia now suggests.  (Reply Memorandum in Support of Defendants'/Counterclaimants' Cross-motion for Summary Judgment on All Claims, filed November 14, 2011 (dkt. no. 27), at 6.)

[46](CGL Coverage Form at SECTION V – DEFINITIONS, § 21 (emphasis added).)

[47](Pltfs' Mem. at 17.)

[48](*Id.*)

> CGL policy. . . .  Although Bartile contends that the duty to defend allows the consideration of extrinsic evidence because the phrase "to which this insurance applies" is the equivalent of "covered claim," the definition of the term "suit" indicates that the duty to defend depends on the "allegati[on][of] liability within the coverage afforded by the policy" rather than on a determination that the suit is actually covered by the policy.  *Estate of Therkelsen*, 27 P.3d at 561.

*Id.* at 1172 (record citations omitted).  The clauses of the CGL policies at issue in *Bartile* contained essentially identical duty-to-defend language and the same definition of "suit" found in the Hartford policy.[49]   The Tenth Circuit construed this language to limit the duty-to-defend inquiry to the four corners of the underlying complaint: "We conclude that the CGL policies here preclude the admission of extrinsic evidence to determine the scope of EMC's duty to defend." *Id.*

Thus, construing the same language in the context of this case, Hartford's duty to defend under its CGL Policy is triggered only if SoftwareMedia can establish that the

---

[49]As the court of appeals recounted:

The CGL policies also contained the following "duty-to-defend" clause:

We will pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for ... 'property damage' to which this insurance does not apply.

A "suit" is "a civil proceeding in which damages because of ... 'property damage' ... to which this insurance applies are alleged."

*Id.* at 1157 n.1 (record citations omitted).

-20-

specific allegations pleaded in the 2010 Microsoft Complaint assert a liability covered by the terms of the Hartford CGL policy.

In *Novell, Inc. v. Fed. Ins. Co.*, 141 F.3d 983, 986 (10th Cir. 1998), the court of appeals propounded a two-part test to determine whether an insurer has a duty to defend an "advertising injury" claim: the court must first determine whether the complaint alleges a "predicate offense," that is, one of the types of conduct specifically listed in the policy's definition of "advertising injury." If such is alleged, then the court must examine whether there is a causal connection between the alleged injuries and the insured's advertising activities.[50]

Here, the first prong of the "advertising injury" test is not satisfied because the 2010 Microsoft Complaint fails to allege any of the relevant conduct listed in the Hartford CGL Policy's definition of "advertising injury," quoted above. The 2010 Microsoft Complaint does not allege damages arising out of "copying in your 'advertisement' [of] a person's or organization's 'advertising idea' or style of 'advertisement'." Rather,

---

[50]Hartford cites additional case law on the latter point.  (*See* Pltfs' Mem. at 19 n.4 (citing *Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 806 (6th Cir. 1996) ("The policy therefore requires some nexus between the ground of asserted liability and the insured's advertising activities."); *Simply Fresh Fruit, Inc. v. Cont'l Ins. Co.*, 94 F.3d 1219, 1221 (9th Cir. 1996) ("[A]ny of the policy's enumerated advertising injuries must be caused by [the insured's] advertising."); *Home Ins. Co. v. Am. Nat'l Can Co.*, No. 97-C-0975, 1997 WL 467180, at * 2 (N.D. Ill. Aug. 12, 1997) ("[T]here must be a proximate causal connection between the advertising activity and the advertising injuries to trigger insurance coverage."); *St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Sys.*, 824 F. Supp. 583, 585 (E.D. Va. 1993) ("[T]he injury caused by predicate offense must result from advertising."), *aff'd*, 21 F.3d 424 (4th Cir. 1994)).)

Microsoft alleged damages caused by SoftwareMedia's fraudulent bait-and-switch scheme.  Nor does the 2010 Microsoft Complaint allege "injury . . . arising out of" an "infringement of copyright, slogan, or title of any literary or artistic work, in your 'advertisement'."  While Microsoft did allege injury to its copyright interests, it did not allege that the injury flowed from infringement in SoftwareMedia's "advertisements," but as the result of SoftwareMedia's fraudulent bait-and-switch sales activities involving licensing of software.  *See IDG, Inc. v. Cont'l Cas. Co.*, 275 F.3d 916, 922 (10th Cir. 2001) (holding that allegations of copyright infringement do not assert "advertising injury" because they arise out of the insured's unlicensed "copying and sale of the plaintiff's software, and *not out of its promotional activity*" (emphasis in original)); *Farmington Casualty v. Cyberlogic Tech.*, 996 F.Supp. 695, 704 n.17 (E.D. Mich. 1998) ("when the claim for infringement exists irrespective of the advertising activities, the claim for defense must fail.").  Moreover, as Hartford submits, "advertising injury" is not implicated here for the reason that the allegations in the 2010 Microsoft Complaint arise from SoftwareMedia's on-line Internet activity, which the CGL Policy language specifically carved out of the definition of "advertisement."

Even assuming, *arguendo*, that the first prong of the *Novell* test was somehow satisfied, the 2010 Microsoft Complaint alleged no causal connection between an "advertisement" by SoftwareMedia and Microsoft's alleged injuries for which it sought relief.  Microsoft did not allege that its "advertising ideas," "style of advertisement," or

copyrights were injured by SoftwareMedia's advertising activity, standing alone. Microsoft alleges that SoftwareMedia's fraudulent bait-and-switch scheme, transacted largely through its website, caused unsuspecting buyers to use Microsoft's software without valid licenses, thereby infringing upon Microsoft's copyrights.  Without a causal connection between the alleged injury and the insured's advertising activities, no "advertising injury" coverage exists under Hartford's CGL Policy.  *See Novell*, 141 F.3d at 990 (finding "neither a predicate offense nor a causal connection between [third-party claimant's] alleged injuries and Novell/WordPerfect's advertising activities" related to Novell/WordPerfect's development of a competing software product); *see also IDG, Inc.*, 275 F.3d at 922; *Sentry Ins. v. R.J. Weber Co.*, 2 F.3d 554, 556 (5th Cir. 1993) (holding that publishing, distributing, and selling copyrighted works lacks sufficient causal connection to sustain coverage for "advertising injury").

SoftwareMedia argues that had Hartford sifted the allegations of the 2010 Microsoft Complaint vigorously enough—"in conjunction with extrinsic evidence provided to The Hartford"— it would have shaken out "Lanham Act print-media slogan infringement claims - a type of "personal and advertising injury" expressly covered by The Hartford's policies," thus triggering Hartford's duty to defend:[51]

> The Hartford was provided with proof of print advertising ran by
> SoftwareMedia which included the phrase "Microsoft Gold Partner," a
> variation of Microsoft's "Gold Certified Partner" slogan.  The express

---

[51](Defs' Mem. at 3.)

> language of the complaint states a claim for damages that arises out of the use of those print slogans. These causes of action are covered under The Hartford's policies.[52]

SoftwareMedia argues that such "print slogan" allegations fall within the CGL Policy coverage because "intent or fraud is not required to recover under a claim for Lanham Act print-media slogan infringement."[53]

> SoftwareMedia concedes that The Hartford would not have had to pay for successful judgments on certain claims in the Microsoft Complaint *if proven at trial that SoftwareMedia acted fraudulently*.  However, the presence of these potentially uncovered claims in the Complaint did not relieve The Hartford of its duty to defend the entire action.[54]

SoftwareMedia points specifically to the allegations of Paragraphs 18 and 19, which allege that SoftwareMedia "advertise and distribute Microsoft software and related products on the Internet, including Defendants' website at www.SoftwareMedia.com. and by other means," and Paragraph 33 of the 2010 Microsoft Complaint, which alleges that "Defendants misappropriated Microsoft's advertising ideas and style of doing business and infringed Microsoft's copyrights, titles and slogans and trademarks."[55]  But Paragraph

---

[52](*Id.* at 3-4.)

[53](*Id.* at 4.)

[54](*Id.* (emphasis added).)

[55](Complaint, filed June 7, 2010, in *Microsoft Corp. v. SoftwareMedia.com, Inc.*, Civil No. 2:10-CV-00526 CW (D. Utah), annexed as Exhibit 1 to Pltfs' Mem., at ¶¶ 18, 33.)

33 does not plead a stand-alone slogan infringement claim;[56] it alleges that the defendants had misappropriated and infringed "by this conduct"—referring to SoftwareMedia's "fraudulent bait-and-switch scheme" as detailed in the fifteen paragraphs of the 2010 Microsoft Complaint that immediately preceded Paragraph 33.

That Microsoft's ¶ 33 "slogan infringement claim" was intrinsically and inseparably tied to the fraudulent bait-and-switch software license scheme is borne out in the pleading of Microsoft's Lanham Act causes of action in its Second and Third Claims. Both claims allege that "*[b]y engaging in bait-and-switch fraud* and other unlawful practices and improper means described in this Complaint, and for the improper purpose of retaining for SoftwareMedia.com the price difference between Microsoft software licenses and Software Assurance," SoftwareMedia had failed to satisfy the conditions for use of Microsoft's marks, and was continuing its use of Microsoft's marks "including the stylized 'Microsoft Gold Certified Partner' logo . . . *in connection to its deceptive sales practices* with the willful and calculated purposes of misleading, deceiving or confusing customers and the public, and trading upon Microsoft's goodwill and business reputation."[57]  Microsoft complained that SoftwareMedia's continuing use of its marks,

---

[56]At page 29 of their memorandum, SoftwareMedia asserts that the 2010 Microsoft Complaint "stated a Lanham-Act claim arising out of the *Inc.* magazine print advertisements"—without citation to the actual pleading, likely because the 2010 Microsoft Complaint makes *no* reference whatsoever to SoftwareMedia's *Inc.* magazine ads.  (*See id.*, *passim*.)

[57](*Id.* at ¶¶ 48, 53, 62 (emphasis added).)  SoftwareMedia argues that the language
(continued...)

logos, symbols and names, "including the stylized 'Microsoft Gold Certified Partner' logo

. . . *in connection with its deceptive sales practices* is likely to cause confusion, mistake or

deception as to the quality, source, origin, or authenticity of products and services

advertised, distributed or sold by" SoftwareMedia.[58]   Microsoft complained of

SoftwareMedia's use of Microsoft's "titles, slogans and trademarks" in Paragraph 33

because such use was "in connection with [SoftwareMedia's] deceptive sales practices,"

which threatened injury to Microsoft's goodwill and reputation because of that fraudulent

conduct.[59]   SoftwareMedia had allegedly "failed to satisfy the conditions for use" of

Microsoft's titles, slogans and marks because SoftwareMedia allegedly used those titles,

slogans and marks in perpetrating a "bait-and-switch" software licensing fraud on their

customers, all for "the improper purpose of retaining the price difference between

Microsoft software licenses" and its Software Assurance maintenance program.[60]

_____

[57](...continued)
"other unlawful practices and improper means described in this Complaint" could "be
read to reference SoftwareMedia's alleged slogan infringement in ¶ 33, for which a
finding of intent or prior knowledge is unnecessary," (Defs' Mem. at 30), but
SoftwareMedia's posited unintentional-slogan-infringement-in-print-advertising theory is
not "described in this Complaint," in ¶ 33 or anywhere else.  Of the paragraphs that
SoftwareMedia points to as "implicat[ing] the 'personal and advertising injury'" covered
by the Hartford CGL Policy, namely 18-19, 33, 46-48, 53, 54, 59-64, only ¶ 33 uses the
term "slogan."

[58](*Id.* at ¶ 51 (emphasis added).)

[59](*Id.* at ¶¶ 51-53, 63, 65.)

[60](*Id.* at ¶ 48, 62.)  This case differs from *Hudson Ins. Co. v. Colony Ins. Co.*,
(continued...)

-26-

SoftwareMedia correctly asserts that under Utah law,

> "[W]hen there are covered and non-covered claims in the same lawsuit, the insurer is obligated to provide a defense to the entire suit, at least until it can limit the suit to those claims outside of the policy coverage." *Appleman on Insurance Law and Practice* § 136.2[D] (2d ed. 2006); *see also Mt. Airy Ins. Co. v. Greenbaum*, 127 F.3d 15, 19 (1st Cir. 1997) ("[I]f an insurer has a duty to defend one count of a complaint, it must defend them all.").

*Benjamin*, 2006 UT 37, at ¶ 25, 140 P.3d at 1216.  But here, Hartford correctly found the allegation of a covered claim for "personal and advertising injury" to be lacking within the four corners of the 2010 Microsoft Complaint, and thus Hartford did not breach its duty to defend under the terms of the CGL Policy issued to SoftwareMedia.

SoftwareMedia cannot cobble together selected allegations of that Complaint with extrinsic evidence of its own print advertising into a discrete negligence-based Lanham Act claim arising from its use of Microsoft slogans in print advertising having no

---

[60](...continued)

624 F.3d 1264 (9th Cir. 2010), in that Microsoft did not allege that SoftwareMedia sold products bearing counterfeit Microsoft slogans or marks, like the counterfeit NFL football jerseys at issue in *Hudson*.  As the 2010 Microsoft Complaint alleged, SoftwareMedia was contractually authorized under the Microsoft Partner Program Agreement to use Microsoft's titles, logos, slogans and marks in advertising—under terms that were breached by using them *in connection with* SoftwareMedia's fraudulent bait-and-switch sales scheme, thus rendering their use unauthorized.  (*See id.* at ¶¶ 46-53, 60-65.) Microsoft had authorized SoftwareMedia to make *non-fraudulent* use of its titles, logos, slogans and marks under its contract, so the mere use of a Microsoft slogan in print advertising was not actionable *per se*—in contrast to the counterfeit NFL "Steel Curtain" jerseys at issue in *Hudson*.

Moreover, the *Hudson* analysis is distinguishable because it applied California law, which looks to extrinsic evidence in *all* cases where the insurer's duty to defend is at issue.  *See Hudson*, 624 F.3d at 1267 (quoting *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal. App. 3d 598, 606, 222 Cal. Rptr. 276, 280 (1st Dist. 1986)).

relationship to its alleged "fraudulent bait-and-switch scheme," which indeed is the gravamen of the 2010 Microsoft Complaint.[61]

**CONCLUSION**

SoftwareMedia's allegedly fraudulent bait-and-switch software licensing scheme is the wrong for which Microsoft sought—and obtained—a judicial remedy in 2010, in addition to a substantial monetary settlement.  The express terms of Hartford's CGL Policy excluding such fraudulent and intentional wrongful conduct from coverage exonerated Hartford of any duty to defend SoftwareMedia against such allegations and from indemnifying SoftwareMedia for the pecuniary consequences that flowed therefrom.[62]

The court also concludes that the Twin City Umbrella Liability Policy "does not apply to 'personal and advertising injury,'" as its Endorsement so clearly says.

---

[61]SoftwareMedia's argument is belied by the express terms of the stipulated Permanent Injunction entered by Judge Waddoups as part of SoftwareMedia's settlement with Microsoft.  The Permanent Injunction strictly forbids SoftwareMedia from marketing Microsoft's Software Assurance product "as a stand-alone product"—striking at the very heart of SoftwareMedia's alleged fraudulent bait-and-switch scheme, which sold customers a software maintenance agreement in lieu of the essential software *licenses* that they thought they were buying.  The Permanent Injunction says *nothing* about SoftwareMedia's continued use of Microsoft's slogans in print advertising, or otherwise.

[62]If, as SoftwareMedia suggests, there is a cautionary tale here, it likely is that commercial vendors who deceive their customers have faint hope of either being defended or indemnified by their general liability insurer where the language of the general liability policy excludes coverage of losses due to fraud or other intentional wrongdoing on the part of the vendor.

For the foregoing reasons,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment, filed August

25, 2011 (dkt. no. 17), shall be and hereby is GRANTED, and that Defendants'/Counter-

claimants' Cross-Motion for Summary Judgment on All Claims, filed September 26, 2011

(dkt. no. 19), shall be and hereby is DENIED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED this 19th day of March, 2012.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge